**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **REBECCA WINKLER,** | : | |
| | : | **Case No. 2:16-cv-629** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Deavers** |
| **WIN WIN AVIATION, INC.,** *et al.*, | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## OPINION AND ORDER

This matter is before the Court on Defendants Win Win Aviation and Vincent LeMay's Motion for Summary Judgment (ECF No. 31). For the reasons set forth below, the Court **GRANTS** Defendants' Motion.

## I. BACKGROUND

### A. Factual Background

Plaintiff Rebecca Winkler is the mother of Ms. Sarah Rhoads and the administrator of her estate. (ECF No. 30 at 7, 49). Ms. Rhoads was an employee of Start Skydiving LLC ("Start Skydiving"), a sky diving business that operates out of the Middletown Regional Airport in Middletown, Ohio. (ECF No. 28 at 5, 8). Start Skydiving serves a variety of customers, including individuals looking to skydive for the first time in tandem, licensed skydivers who come to Start Skydiving to skydive alone, and accelerated free-fall students who are in the process of learning to skydive on their own. (*Id.* at 17).

#### 1. Start Skydiving's Business Operations

Approximately twenty to twenty-two employees work at Start Skydiving on an average day. (*Id.* at 33). About ten to fifteen of the employees are skydiving instructors. (*Id.*). Two of

the employees are line personnel, who are responsible for fueling the aircraft and loading the skydivers onto the plane. (*Id.*). The line operators wear yellow vests and hearing and eye protection. (*Id.* at 57). Line operators are typically the only individuals permitted on the ramp or in the tarmac area, which is denoted by a red line that is meant to signify to individuals not to proceed without authorization. (*Id.* at 28-30). In order to have authorization to enter the tarmac, employees at Start Skydiving must go through a seven-day training that the principal owner of Start Skydiving, Mr. John Hart, described as "pretty extensive" and "quality." (*Id.* at 29-30). During training, employees learn about propeller safety and the risks associated with moving aircrafts and propellers. (*Id.*). Employees are trained not to approach an airplane that has a moving propeller from the front. (*Id.* at 59).

In addition to the line personnel and the skydiving instructors employed on an average day, Start Skydiving usually employs approximately four people to work in the manifest office, which is the greeting area where skydivers first go upon arrival. (*Id.* at 25, 33). After the skydivers arrive, they fill out a liability waiver, which must be signed before an individual can pass the yellow line that denotes the start of the loading area, where passengers wait to be loaded on the next flight. (*Id.* at 22, 26, 52). Employees are also required to sign the waiver in order to go past the yellow line. (*Id.* at 22; ECF No. 31-3). The waiver includes an "Assumption of Risk" section that states, in relevant part:

> I know and understand the scope, nature, and extent of the risks involved in the activities covered by this Agreement. I understand that these risks include, but are not limited to: . . . improper and/or negligent operation and/or use of the equipment; aircraft malfunction and/or negligent aircraft operation; careless and/or negligent instruction and/or supervision. I voluntarily, freely and expressly choose to incur all risks associated with the activities covered by this Agreement, understanding that those risks may include personal injury, damage to property, and/or death.

(ECF No. 31-3 at ¶ 1). The waiver agreement also includes an "Exemption and Release from Liability" section that purports to release "Start Skydiving, LLC; all aircraft owners, and pilots with whom it contracts for flying services," among others, from "any and all liability claims, demands or actions or causes of action whatsoever arising out of damage, loss or injury to me or my property, or my death, while upon the premise or aircraft or while participating in any of the activities covered by this Agreement, whether resulting from the negligence and/or other fault, either active or passive, of any of Releases, or from any other cause." (*Id.* at ¶ 2). Once the skydivers sign the waiver agreement, they are permitted to cross the yellow line into the loading area when it is the appropriate time for their group to do so. (ECF No. 28 at 26). The passengers are then allowed to cross the red line into the tarmac area to get loaded onto the plane only when the plane is pulled up at a complete stop and the line personnel bring the passengers forward. (*Id.* at 28-29).

On a typical business day, Start Skydiving completes approximately sixty "loads," meaning the plane takes off, a group of passengers jump out of the plane, and the plane lands about sixty times in one day. (*Id.* at 35). Each load cycle takes approximately twenty to thirty minutes to complete: a couple of minutes to load passengers, about thirteen minutes to climb to altitude, and eight minutes to descend.[1] (*Id.* at 36). To get as many loads in as efficiently as possible, Start Skydiving does not typically shut down the engines of the planes between loads. (*Id.* at 37). Mr. Hart, testified that the "planes will run from when we start until we shut down the last load of the day" because after a plane is shut down, the cool down period is fifteen to twenty minutes (depending on the outside temperature) and it is cheaper for the planes to continue to run than to shut them down for twenty minutes. (*Id.* at 5, 37-38). Mr. Hart further

---

[1] These estimations were given in relation to the specific type of plane used on June 1, 2014 and thus could vary for different aircrafts.

testified that keeping the planes running, rather than shutting them down, is "an encouraged practice." (*Id.* at 38).

Start Skydiving owns three of the aircrafts that it uses for its skydiving operation, and occasionally utilizes other aircrafts that it does not own. (*Id.* at 6). One company that Start Skydiving obtains other aircrafts from is Defendant Win Win Aviation, Inc. ("Win Aviation"). (*Id.*). Start Skydiving and Win Aviation have had a business relationship for at least as long as Start Skydiving has been located at Middletown Airport, which was seven years as of Mr. Hart's deposition in April of 2017. (*Id.* at 5-6). Win Aviation had a "wet lease agreement," with Start Skydiving, which means that when Win Aviation provided a plane for Start Skydiving, it also provided the pilot and the insurance, and the only thing Start Skydiving provided was the fuel. (ECF No. 37 at 26). Thus, every time Start Skydiving used an aircraft from Win Aviation, the plane always came with a pilot. (ECF No. 28 at 7). When Start Skydiving needed to utilize an aircraft from Win Aviation, it would typically ask for a Tailgate, which is a rear-exit aircraft. (*Id.* at 19). Start Skydiving typically used single-propeller aircrafts in their operations, but sometimes they would get a twin propeller plane—a plane with a propeller on each side, rather than just one in the front—from Win Aviation. (*Id.* at 19, 72). Start Skydiving uses dual-engine planes approximately four times a year. (*Id.* at 72).

### 2. June 1, 2014 Incident

On June 1, 2014, Ms. Rhoads was working in the front office at Start Skydiving. Ms. Rhoads began working at Start Skydiving in the front office in 2011 or 2012, and was promoted to Office Manager Manifest in 2014. (*Id.* at 8-9; ECF No. 30 at 28). In that role, Ms. Rhoads was responsible for all of Start Skydiving's front office operations, which include receiving payments, generating cash receipts, manifesting slots for sky diving customers on each aircraft,

assigning sky divers to instructors, calling out sky diving times, and communicating with pilots over the radio. (ECF No. 28 at 8, 39-40). Her tasks did not require her to leave the manifest office, but it was not uncommon for her to talk to people in the loading area and she was authorized to enter the tarmac. (*Id.* at 39-40; 56). Mr. Hart testified that Ms. Rhoads underwent the required seven day training and was trained to appreciate the risks and hazards associated with a moving propeller, and trained to take all steps necessary to avoid injury by avoiding coming into contact or close proximity to a moving propeller. (*Id.* at 30-31). Ms. Rhoads also signed the liability waiver, as required by all staff. (*Id.* at 22-23; ECF No. 31-3).

Sometime before May 31, 2014, Start Skydiving contacted Win Aviation to inquire into the possibility of utilizing an aircraft and pilot for business operations on May 31, 2014 and June 1, 2014. (ECF No. 28 at 18). All of the aircrafts owned by Start Skydiving were unavailable for that weekend because they were either committed to skydiving demonstrations in Florida or needed maintenance, and thus Start Skydiving needed to bring in a specialty aircraft for support. (*Id.* at 16). The general manager and part owner of Start Skydiving, Gene Newsom, coordinated with Win Aviation, and a verbal agreement was entered into for the weekend as a continuation on previous leases Win Aviation and Start Skydiving had executed. (ECF No. 28 at 18; ECF No. 37 at 26). The aircraft that was leased for the weekend was a De Hallivand DHC 6-200 Twin Otter (the "Twin Otter"), which is a double-propeller plane. (ECF No. 27 at 14).

As usual, the aircraft leased for the weekend came with a pilot. The pilot was Defendant Vincent LeMay. (ECF No. 27 at 6). Mr. LeMay worked for his father's company, Parachutisme Nouvel Air ("Nouvel Air"), located in Canada, and also self-contracted for a variety of flying jobs on the side. (*Id.* at 10-11). A few days before June 1, 2014, Mr. LeMay flew commercial from Canada to Chicago and then drove to DeKalb, Illinois, the home base of Win Aviation,

with the intention of getting the Twin Otter—a plane he has flown many times before—to fly a contract through his father's company in Trenton, a military base in Canada. (*Id.* at 15-16, 18). When Mr. LeMay was on his way to DeKalb, Win Aviation told him that Start Skydiving was having some problems with their airplane and asked him if he could stop at Start Skydiving on his way to Trenton and give them a hand for two days before flying to Trenton on Sunday, June 1. (*Id.* at 18). Mr. LeMay had flown planes owned by Win Aviation for skydiving companies before, invoicing his time to Win Aviation as a self-employee. (*Id.* at 21-22). Nouvel Air had a contract with Win Aviation, and Win Aviation would subtract payments owed to Mr. LeMay from the contract payments if the job was in the scope of the contract, or would pay Mr. LeMay through a Canadian account in a wet-lease situation. (ECF No. 37 at 35-36). Mr. LeMay accepted the job for May 31 and June 1, and flew the Twin Otter at Start Skydiving all day on Saturday, May 31, 2014, with no incident. (ECF No. 27 at 28). Ms. Rhoads was working in the manifest Saturday. (*Id.* at 35).

On Sunday, June 1, 2014, Mr. LeMay began working at Start Skydiving around 9:00 or 9:30 a.m. (*Id.* at 37). He was the only pilot completing loads that day. (ECF No. 28 at 35). Mr. LeMay completed approximately ten loads in the morning, typically landing the plane in boarding area number 1. (*Id.* at 53). Around noon, he landed the plane between loading areas 1 and 2, where a skydiver and instructor, who were waiting with the ladder to board, indicated for him to stop. (*Id.* at 67, 84; ECF No. 31-5 at ¶ 7). Mr. LeMay parked in front of the instructor and the skydiver so they could safely enter the aircraft from the rear. (ECF No. 27 at 84). Mr. LeMay landed the plane with the nose of the aircraft pointing inward toward the loading area, though Start Skydiving typically positions the planes with the nose pointing away from the loading area. (ECF No. 31-5 at ¶ 9; ECF No. 28 at 76). The tip of one of the wings went over

the red line, in contravention of Start Skydiving's procedure of having the entire aircraft on the tarmac side of the red line, but the propellers were correctly inside the tarmac. (ECF No. 28 at 47, 75; ECF No. 27 at 88).

After Mr. LeMay landed the Twin Otter around noon, the student and instructor waiting with the ladder boarded the plane. (ECF No. 27 at 88). The rest of the passengers had not boarded yet, and while waiting for them to board, Mr. LeMay called Ms. Rhoads on the radio and asked whether Start Skydiving was getting anything for lunch. (*Id.* at 47, 84). Mr. LeMay testified that he remembers having an idea that sometimes an employee of Start Skydiving would go into town and get lunch because there was only one grill at the drop zone. (*Id.*). Mr. Hart testified that it was "normal practice" for Start Skydiving to provide the pilot with lunch. (ECF No. 28 at 54). Ms. Rhoads gave Mr. LeMay a few lunch options, including "something like Subway," and Mr. LeMay said Subway would be fine for him. (ECF No. 27 at 47-48). Ms. Rhoads then asked for Mr. LeMay's order, and he started giving his order over the radio, but then she said "Hold on. There is a delay with the jump. The jumpers are not quite ready, so I am going to come and see you." (*Id.*).

Mr. LeMay testified that before he could finish saying that coming out to see him was not necessary, Ms. Rhoads was already out of the manifest. (*Id.*). She was running with a paper and pen in her hands. (*Id.* at 50-51). He testified that Ms. Rhoads crossed the yellow line and ran toward the aircraft at the plane's 10:00 to 11:00 position (with the aircraft's nose facing 12:00 and its rear facing 6:00). (*Id.* at 52). According to Mr. LeMay, Ms. Rhoads was first running toward the pilot door on the side of the plane, and then abruptly changed her direction and ran toward the back passenger door, crossing over the red line. (*Id.* at 50-52). Mr. LeMay testified that he tried to get Ms. Rhoads' attention as she was running to signal her to stop, but she did not

look up at him.  (ECF No. 27 at 50-51).  Mr. Tom McClellan, a frequent skydiver at Start Skydiving, helped load the aircraft that day.  (ECF No. 31-5).  He declared that he observed the pilot put his hand out the window to wave Ms. Rhoads away when she was in front of the left wing.  (*Id.*). Unfortunately, Ms. Rhoads came too close to the aircraft and was struck by the left propeller and fell forward. (ECF No. 27 at 50-51; ECF No. 31-5 at ¶ 13).  She was taken to the hospital but died of injuries two days later, on June 3, 2014.  (ECF No. 30 at 93).

### B.    Procedural Background

Ms. Winkler, as the administrator of Ms. Rhoads' estate, initially filed this action in the Franklin County Court of Common Pleas against Win Aviation, Mr. LeMay, and the State of Ohio, Bureau of Workers' Compensation ("BWC"), bringing survivorship and wrongful death claims on the basis of Win Aviation and Mr. LeMay's alleged negligence.  (ECF No. 1). Defendants removed the action to the United States District Court for Southern District of Ohio on June 30, 2016.  (*Id.*).  BWC filed an Answer on the same day, bringing crossclaims against Mr. LeMay and Win Aviation.  (ECF No. 3).  Mr. LeMay and Win Aviation answered both Ms. Winkler's Complaint and BWC's crossclaims on July 7, 2016.  (ECF Nos. 5, 6).  Mr. LeMay and Win Aviation filed the instant Motion for Summary Judgment on October 20, 2017.  (ECF No. 31).  Oral argument on the Motion was held on August 17, 2018.  (ECF No. 40).  The Motion for Summary Judgment is ripe for decision.

### II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences

must be drawn in the non-moving party's favor. *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 251-52 (1986)). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## III.    ANALYSIS

Both of Ms. Winkler's claims against Win Aviation and Mr. LeMay are predicated upon Win Aviation and Mr. LeMay's alleged negligence. Under Ohio law[2], in order to recover on a negligence claim, a plaintiff must prove: "(1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, and (3) that the breach of the duty proximately caused the plaintiff's injury." *Chambers v. St. Mary's Sch.*, 82 Ohio St. 3d 563, 565, 697 N.E.2d 198, 200 (Ohio 1998). The absence of any one of these elements renders a plaintiff's claim insufficient as a matter of law. *Vadaj v. French*, 2017-Ohio-1370, ¶ 10, 89 N.E.3d 73, 77. The Court finds that Mr. LeMay and Win Aviation did not owe Ms. Rhoads a duty, and thus the remainder of the elements need not be addressed.

The existence of a duty is fundamental to establishing negligence: if there is no duty, no legal liability can arise on account of negligence. *Jeffers v. Olexo*, 43 Ohio St. 3d 140, 142, 539

---

[2] Federal courts sitting in diversity cases apply the substantive law of the state. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R. Co. v. Tompkins*, 58 S. Ct. 817 (1938)). The parties agree that Ohio law applies to this action.

N.E.2d 614, 616–17 (Ohio 1989). The existence of a duty is a question of law for the Court to determine. *Lutz v. Chitwood*, 337 B.R. 160, 168 (S.D. Ohio 2005) (citing *Mussivand v. David,* 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 270 (Ohio 1989)). There is "no set formula" for a court to use in determining whether a duty exists. *Id.* The Ohio Supreme Court has described duty as "the courts expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Mussivand*, 45 Ohio St. 3d at 318 (quoting Prosser, Law of Torts (4th Ed. 1971) pp. 325-26)). Such considerations include "the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall." *Id.* (citing Prosser, *Palsgraf Revisited* (1953), 52 Mich. L. Rev. 1, 15)). A duty may be established by common law, legislative enactment, or by the particular facts and circumstances of a case. *Leizerman v. Kanous*, 181 Ohio App. 3d 579, 583, 2009-Ohio-1469, ¶ 13, 910 N.E.2d 26, 28. Defendants argue that they did not owe Ms. Rhoads a duty for two independent reasons: (1) the accident was unforeseeable; and (2) the primary assumption of risk doctrine negates any duty Defendants owed. The Court finds that the accident was not foreseeable, and thus declines to address the applicability of the primary assumption of risk doctrine.

The Ohio Supreme Court has stated that "[t]he existence of a duty depends on the foreseeability of the injury." *Menifee v. Ohio Welding Prod., Inc.*, 15 Ohio St. 3d 75, 77, 472 N.E.2d 707, 710 (Ohio 1984); *see also Frazier v. CSX Transp., Inc.*, 156 F.3d 1229 (6th Cir. 1998) ("The foreseeability of the injury to a person in plaintiff's position determines whether a duty exists") (citing *Jeffers*, 539 N.E.2d at 616-17)). The test for foreseeability is "whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Menifee*, 15 Ohio St. 3d at 77. If the defendant

"knew or should have known that its act was likely to result in harm to someone" then the injury was foreseeable. *Simmers v. Bentley Constr. Co.*, 64 Ohio St. 3d 642, 645, 597 N.E.2d 504, 507 (Ohio 1992). Foreseeability of harm is "not affected by the magnitude, severity or exact probability of a particular harm, but instead by the question of whether some risk of harm would be foreseeable to the reasonably prudent person." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St. 3d 257, 263, 2015-Ohio-229, ¶ 24, 29 N.E.3d 921, 928–29 (emphasis omitted).

Defendants argue that Mr. LeMay could not have foreseen this his conduct would cause Ms. Rhoads' injury. (ECF No. 31 at 10). Defendants contend that Start Skydiving did not contract with Win Aviation or Mr. LeMay to do anything other than pilot an aircraft—Start Skydiving did not ask Mr. LeMay, for example, to provide jumpers with gear or instruction, to ensure line personnel wore proper protection, or to ensure that Start Skydiving employees, including manifest personnel, approached the Twin Otter in compliance with Start Skydiving policy and training. (*Id.* at 10-11). Given Mr. LeMay's limited role, Defendants argue that the danger of Ms. Rhoads leaving the manifest office and running into a moving propeller was at most "remote and doubtful." (*Id.* at 11). Defendants point out that Ms. Rhoads had radio communication with pilots, but voluntarily left her desk, ran past the yellow line and over the red safety line, and then abruptly changed her route and ran under the left wing of an operating aircraft in contravention of her training. (*Id.*). Defendants thus contend that it was unforeseeable that Ms. Rhoads would cross onto the tarmac and attempt to enter the aircraft on the side as she did, instead of going to the rear entrance, which would have been safe. (*Id.* at 13).

In support of their argument, Defendants rely primarily on three Ohio cases. First, in *Loupe v. Miller*, the Court of Appeals for the Tenth District affirmed summary judgment in favor

of defendant homeowners when their housekeeper was injured as a result of a chair collapsing. No. 94APE05-780, 1995 WL 3830, at *1 (Ohio Ct. App. Jan. 5, 1995). The homeowners asked the plaintiff to clean chandeliers in their house, and the plaintiff stood on nearby chairs to do so. *Id.* at *2. The court found that it was not foreseeable that the chair would collapse. Indeed, the plaintiff herself did not anticipate the injury, and she alleged no facts to show that the defendants could have, or should have anticipated that the chair would collapse. *Id.* at *3.

In the second case, *Vadaj v. French*, the defendants were setting off fire works in a picnic area near where plaintiff's boat was docked. *Vadaj v. French*, 2017-Ohio-1370, ¶ 4, 89 N.E.3d 73, 76. Plaintiff was asleep, and the noise caused her to jump out of bed and begin running up the stairs in the dark. She hit her foot on the step and was injured. The Ohio Supreme Court found that the defendants did not owe the plaintiff a duty because the injury to the her foot was not foreseeable—a reasonably prudent person would not have anticipated that an injury to the plaintiff, who was asleep inside her cabin, would be caused by letting off fireworks, especially in light of the fact that there was no evidence she was injured by the fireworks. *Id.* at 77-78.

Finally, in *Goodman v. American Electric Power*, the Ohio Supreme Court found that the defendant did not owe the plaintiff a duty. In that case, plaintiff and defendant were both hired to perform electrical work at a third party's home. 2015-Ohio-5130, ¶¶ 31-33, 53 N.E.3d 930, 935–36. Defendant set up a ladder and attached a pulley and a rope to it, tying the rope to an electrical line called a "service drop". *Id.* at 932. Unbeknownst to defendant, plaintiff climbed up defendants' ladder to perform some of his work. *Id.* at 933. Defendant then began pulling the service drop toward him, which caused the ladder to move and the plaintiff fell from the ladder. The court held that it was not foreseeable that plaintiff would climb onto defendant's ladder, while defendant was still using the ladder as evidenced by the rope and pulley, without

permission or advance notice, when plaintiff had his own ladder. *Id.* at 935-36. The court thus found no duty existed. *Id.*

Ms. Winkler agrees that the existence of a duty turns on foreseeability, but argues that what happened to Ms. Rhoads was foreseeable. (ECF No. 34 at 6-7). She argues that Mr. LeMay testified that earlier in his career, he had seen one or two people approach a plane from the front while a propeller was moving, and that in those instances he told them not to do so again. (*Id.* (citing ECF No. 27 at 88-89)). Ms. Winkler further points to evidence in the record that Mr. LeMay stopped the aircraft in the wrong location, pointed the nose in the wrong direction, and allowed the left wing to extend out past the red safety line. (*Id.* at 7). Ms. Winkler argues that the aircraft Mr. LeMay was operating had propellers on each side, in contrast to the single propeller planes Start Skydiving usually used, and despite Mr. LeMay not giving a safety briefing to Ms. Rhoads or anyone else, he left the engine of the plane running and called her to ask about lunch. (*Id.* at 7-8). In these circumstances, Ms. Winkler contends that the injury was foreseeable and Mr. LeMay thus owed Ms. Rhoads a duty of care. (*Id.* at 8).

In support of her position, Ms. Winkler relies on one case: *Frazier v. CSX Transportation, Inc.*. In *Frazier*, the plaintiff was working as a flagman at a temporary railroad crossing on August 6, 1993. 156 F.3d 1229, 1998 WL 449684, at *1 (6th Cir. 1998). Prior to that date, the previous flagman informed the defendant company that there was a dust problem, created by passing trains unsettling dirt. *Id.* The defendant company agreed to "water" the area three times per day to help with the dust problem, but did not do so before 9:00 a.m. because of a belief that the hazard of the dust was mitigated by morning dew. *Id.* On the morning of the 6th, a train passed and generated a substantial amount of dust, causing plaintiff to fall and injure his back. *Id.* The district court found that it was not foreseeable that an injury would occur in the

morning. *Id.* at *3. The Sixth Circuit reversed, finding that the mere fact that dust clouds had never been created that early in the morning was not determinative. The court noted that plaintiff produced evidence that defendant was aware of a dust problem at the crossing, no one warned him about the problem, and no warning signs existed at the site. *Id.* at *5. The court thus found that the issue of foreseeability should have been reserved for the trier-of-fact. *Id.*

Upon consideration of the cases cited by the parties and their respective arguments, the Court finds that the accident was not foreseeable and thus Defendants did not owe Ms. Rhoads a duty as a matter of law. A reasonably prudent person in Mr. LeMay's position could not have anticipated that any of his actions would lead to Mr. Rhoads' injury. Ms. Rhoads worked at Start Skydiving for approximately three years before the incident, and in all of that time, Mr. Hart does not recall her ever crossing the red line to enter the tarmac, though she did often cross the yellow line to enter the passenger loading area. (ECF No. 30 at 29; ECF No. 28 at 39-40, 56). While Ms. Winkler contends that Mr. LeMay had seen "one or two" people in his career approach an aircraft from the front, Mr. LeMay testified that he had never seen someone other than a jumper or someone who has something to do with the airplane (e.g., a line operator) come near a plane while it was running. (ECF No. 27 at 88-89). Ms. Rhoads, and all Start Skydiving employees, were trained to appreciate the hazards of a moving propeller. (ECF No. 28 at 30-31; ECF No. 29 at 47). All of these factors weigh in favor of finding that the accident was not foreseeable.

Ms. Winkler focuses on the following actions, or inactions, of Mr. LeMay in arguing that the injury was foreseeable: (1) failing to give a safety briefing to Ms. Rhoads and skydiving passengers; (2) landing the plane in a way that violated some of Start Skydiving's standard procedures; (3) leaving the engine running; and (4) radioing the manifest office to inquire about

14

lunch.  None of these actions, however, would have lead a reasonable person to anticipate that an injury was likely to result.

Regarding the first inaction, Ms. Winkler's argument depends heavily on the testimony of her expert, Mr. Keith Cianfrani, who testified that Mr. LeMay should have given a safety briefing to Start Skydiving personnel and passengers.  (ECF No. 29 at 48, 51, 58).  Mr. Cianfrani's report states that a briefing should have been done pursuant to CFR 91.519.  (ECF No. 29 at Ex. 1).  That regulation, however, applies only to passengers, and Ms. Rhoads was a front office employee.  *See* CFR 91.519 ("Before each takeoff the pilot in command of an airplane carrying passengers shall ensure that all *passengers* have been orally briefed on the following") (emphasis added); (ECF No. 29 at 59).  The regulation also states a pilot need not give an oral briefing if the pilot determines the passengers are familiar with the contents of the briefing.  *Id.*  Further, Mr. Cianfrani agreed in his deposition that there is no regulation that says Mr. LeMay should have briefed ground personnel or employees at Start Skydiving, offering only that it was "a good practice to have if you want to promote a safety management program." (ECF NO. 29 at 67).[3]   The undisputed testimony, however, is that Ms. Rhoads already knew how to safely enter and exit an aircraft, as it was covered in her training, and she disregarded her training in approaching a moving aircraft from the front.  (ECF No. 28 at 59).  Indeed, Ms. Rhoads received a safety briefing every year she was employed at Start Skydiving, and Mr. Cianfrani agreed her training covered different types of aircrafts.  (ECF No. 31-1 at 2; ECF No. 29 at 53).  Further, the evidence shows that it was the responsibility of Start Skydiving

---

[3] Additionally, Mr. Cianfrani, testified at one point that the briefing should have been given "at least to the personnel who would be working around the aircraft" and it is undisputed that Ms. Rhoads was a front office employee whose job duties did not require her to enter the tarmac. (ECF No. 29 at 48; ECF No. 28 at 40).

employees to tell individuals how to enter and exit the aircraft safely and that none of that responsibility was delegated to Win Aviation. (ECF No. 29 at 45-46).

As for the criticisms of the way Mr. LeMay landed the plane, the position of the plane does not make it more foreseeable that an office employee would enter the tarmac for the first time. In any event, it is undisputed that the propeller was on the correct side of the red line and Ms. Rhoads would not have been struck by it had she not crossed the red line. (ECF No. 27 at 88).[4] Turning to the third action, leaving the engine running, it is undisputed that it is Start Skydiving's standard practice to leave the aircraft's engine running in between loads. (ECF No. 28 at 37). Indeed, Mr. Hart testified that it is "encouraged practice." (*Id.*). While Mr. Cianfrani testified that it would be "more prudent" to shut the engines down, there is no evidence in the record that leaving the engine on—as pilots at Start Skydiving always do—makes an injury foreseeable. (*See* ECF No. 29 at 37). Further, the record indicates that a reasonable person would hear the engine running because of the noise and appreciate the risk posed by a moving propeller. (ECF No. 29 at 76). As for the final action, radioing the front office to inquire about lunch, it is undisputed that it is Start Skydiving's typical practice to provide its pilots with lunch.

---

[4] Additionally, even if the Court were to find a duty and analyze the remaining elements of negligence, there is no evidence in the record to support a finding of causation with respect to the position of the plane. Mr. Hart was critical of the position for three reasons: (1) the plane was parked on the incorrect spot in the tarmac; (2) the nose was facing the wrong way; and (3) one of the wing tips was over the red line. (ECF No. 28 at 75-76). None of these three things, however, caused Ms. Rhoads' injury. Mr. Hart testified that the reason the first two items are typically done differently—planes are parked in a different spot and the nose is facing a different way—is to make room to safely park a second plane and so that the propeller blast is not blowing back into the loading area. (ECF No. 28 at 47). It is undisputed, however, that Mr. LeMay was the only pilot flying the only aircraft in operation at Start Skydiving that day. (ECF No. 28 at 35). And there is no reason to believe the propeller blast blowing into the loading area had any effect on the accident. As for the third item, the wing tip being over the red line, it is undisputed that Ms. Rhoads crossed over the red line before the propeller struck her. (ECF No. 27 at 88). Thus, whether the wing tip was over the red line is immaterial.

(ECF No. 28 at 54). Radioing the front office to inquire about a typical practice does not make it reasonably foreseeable that an individual would leave the office and run onto the tarmac, apparently for the first time in three years, and approach a running aircraft from the front, in contravention of safety training.

In sum, there is no evidence in the record that leads to the conclusion that the accident involving Ms. Rhoads was foreseeable. Unlike in *Frazier*, there is no evidence that Mr. LeMay or anyone at Win Aviation was aware that Ms. Rhoads, a front office employee, would cross the red line and approach the plane from an unsafe direction, and Ms. Rhoads had been warned—both by a sign and through yearly training—of the danger of entering the tarmac and getting too close to a moving propeller. *Compare* 1998 WL 449684, at *5 (noting that plaintiff produced evidence that defendant was aware of a dust problem at the crossing, no one warmed him about the problem, and no warning signs existed at the site). A pilot "is not required to anticipate every possible action of passengers or other persons, and it need not anticipate abnormal casualties not reasonably to be expected to occur." *Atcheson v. Braniff Int'l Airways*, 327 S.W.2d 112, 118–19 (Mo. 1959). A reasonably prudent person in Mr. LeMay's position would not have foreseen the accident. The Court therefore finds that no duty exists.

## IV. CONCLUSION

The Court finds that the Defendants did not owe a duty to Ms. Rhoads because her injury was not reasonably foreseeable. Win Aviation and Mr. LeMay's Motion for Summary Judgment (ECF No. 31) is therefore **GRANTED**. Ms. Winkler's claims against Win Aviation and Mr. LeMay are hereby **DISMISSED**.

**IT IS SO ORDERED.**

                      **\_\_\_\_s/ Algenon L. Marbley_____**
                      **ALGENON L. MARBLEY**
                      **UNITED STATES DISTRICT JUDGE**

**DATED:  September 10, 2018**